J-S18002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2757 EDA 2016 |

Appeal from the Decree and Order Entered July 27, 2016
In the Court of Common Pleas of Philadelphia County
Domestic Relations at No(s):  CP-51-AP-0000796-2015,
CP-51-DP-0001269-2012

BEFORE:   PANELLA, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 10, 2017**

K.W. ("Father") appeals from the decree entered July 27, 2016, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia County Department of Human Services ("DHS") and involuntarily terminating his parental rights to his minor, dependent son, D.W., born in July 2012 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b). Father further appeals the order entered July 27, 2016, changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[1] We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] As Father did not raise the change of Child's permanency goal to adoption in his concise statement of errors complained of on appeal, we find the issue is waived. **See Dietrich v. Dietrich**, 923 A.2d 461, 463 (Pa. Super. 2007)
*(Footnote Continued Next Page)*

The trial court summarized the relevant procedural and factual history, including as related to Mother, in part, as follows:[2]

> On January 17, 2006, [DHS] received a General Protective Services (GPS) [r]eport alleging that [c]hildren's [m]other, T.J., suffered from depression and anxiety. Mother attempted to stab herself in the stomach prior to giving birth. Mother stated that she did not want to give birth to her third child. Mother tested positive for marijuana and benzodiazepines. Mother stated that the [c]hildren's [m]aternal [a]unt, A.D., would care for the newborn child. This [r]eport was substantiated.

> On May 18, 2006, DHS implemented Services to Children in Their Own Homes (SCOH) Level II through Jewish Family and Children Services (JFCS). This service was discharged on June 26, 2008.

> On February 4, 2008, DHS received a Child Protective Services (CPS) [r]eport alleging that Mother's fourth child, a daughter, suffered from hand tremors due to nerve disorders. The [c]hild had difficulty holding a pencil and she was not meeting age appropriate milestones. The [c]hildren's [m]aternal [g]randmother, D.P., escorted the [c]hild to the Philadelphia District Health Center #5. The [c]hild was referred to see a neurologist in 2007. School staff made numerous outreach attempts to reach Mother. Mother stated that her hands would tremble also; however, she did not say whether she planned to take the [c]hild to the neurologist. This report was indicated due to medical evidence and Mother was named as the perpetrator.

> On May 13, 2010, DHS received a GPS [r]eport alleging that Mother was talking on the telephone and her daughter was being disrespectful. Mother placed the phone down and punched her daughter in her mouth. It was unknown if the daughter sustained any injuries, pain or impairment as a result. Mother

_(Footnote Continued)_ ───────────

(stating any issues not raised in Rule 1925(b) statement are waived on appeal).

[2] As the trial court addressed Mother's behaviors, and given the significance of the response and reaction of Father, we include this background.

was abusing drugs and not providing adequate care for [c]hildren. There was no running water in the home and the [c]hildren were rotating between sleeping on the floor and a mattress. The [c]hildren wore the same clothing and appeared dirty and unkempt. Mother had not taken daughter to see a neurologist. Mother was abusing wet[3] and pills. This [r]eport was substantiated.

On July 16, 2012, DHS received a GPS [r]eport alleging that T.J., Mother, gave birth to D.W., the [c]hild in this case. Mother tested positive for marijuana, benzodiazepines and PCP at Temple University Hospital. The [c]hild's drug test was pending.[4] Mother stated that she relapsed on July 13, 2012. Mother stated that she used cocaine, Xanax, and PCP because she was stressed. Mother stated that she had been smoking marijuana since she was 16 years old and actively using PCP since 2010. Mother resided with the paternal side of the family and stated that she planned to move. The [c]hild's [f]ather, K.W., was visiting the [c]hild and giving support to the family. The [r]eport was substantiated.

On July 17, 2012, DHS met with Mother at Temple University Hospital. DHS learned that Mother tested negative for marijuana. Mother admitted to using drugs and stated that she wanted to begin treatment. DHS suggested that Mother receive inpatient drug and alcohol treatment; however, she stated that she did not have medical insurance.

On July 17, 2012, DHS visited Father at the address where he was temporarily residing. Father became irate and DHS was unable to conduct a home assessment.

---

[3] "'Wet,' one of the mixture's street names, can be used to refer both to a marijuana cigarette dipped in liquid PCP and to the PCP component on its own, which is also used to coat ordinary cigarettes and other substances." What is Wet? Dangerous Drug Cocktail, available at http://www.livescience.com/22917-wet-pcp-marijuana.html (last visited March 20, 2017).

[4] DHS social worker Rimoini Peace testified that Mother tested positive for cocaine, benzodiazepines, and opiates—and Child tested positive for cocaine and benzodiazepines. N.T., 7/27/16, at 8. Ms. Peace also stated that Child was "exposed to a life-threatening illness." *Id*., at 6-7.

On July 18, 2012, DHS learned that Mother and Child were ready for discharge from Temple University Hospital.

On July 18, 2012, DHS obtained an Order of Protective Custody (OPC) for this [c]hild and placed him in a foster care home through Children's Choice, Inc. (CCI), where he currently remains.

A Shelter Care Hearing was held on July 19, 2012, before the Honorable Thomas M. Nocella. The [c]ourt lifted the OPC and found that legal custody of the [c]hild would remain with [DHS]. The [c]hild's placement to remain in [f]oster [c]are. Child receives medical treatment at St. Christopher's Hospital for a health condition. Father's address is [on] Braddock St., Philadelphia, PA 19134. DHS to conduct a home assessment of Father's home. Both Mother and Father are referred to CEU forthwith for drug screen, assessment, and dual diagnosis. Child safe as of 7/18/2012.

An Adjudicatory Hearing was held on August 27, 2012, before the Honorable Thomas M. Nocella. The [c]ourt found legal custody of the Child remains with DHS, and the [d]ependent [c]hild is to be placed by DHS in [f]oster [c]are through [CCI]. Mother to comply with all CEU recommendations. Father referred to CEU for evaluation, full drug and alcohol screen dual diagnosis. DHS to apply for Child's birth certificate, FSP meeting within 30 days. Parents permitted supervised visits as arranged by the parties.

On October 8, 2012, Father completed an evaluation at CEU. CEU recommended that Father attend his intake appointment at the Wedge Medical Center on October 12, 2012, and follow through with treatment.

Trial Court Opinion, 11/1/16, at 2-5 (citations to record omitted).

The trial court held regular permanency review hearings in this matter. Throughout these reviews, the court maintained Child's commitment and placement. On April 16, 2014, the court reunified Child with Father. Mother's visitation with Child was to remain supervised through the agency. *See* Permanency Review Order, 4/16/14.

- 4 -

Thereafter,

[o]n April 24, 2014, DHS received a GPS [r]eport alleging that Mother gave birth to another Child at Hahnemann University Hospital and she tested positive for benzodiazepine, cocaine, and opiates. The newborn's drug screen results were still pending. Mother tested positive for cocaine and phencyclidine (PCP) during her one and only prenatal visit at Thomas Jefferson University Hospital in February 2014, and she suffered from depression. Mother still appeared to be under the influence of drugs. Mother stated that she had a substance abuse problem and would do whatever was necessary for her to keep the newborn. Mother stated that she was fully prepared to care for the newborn and was willing to do so with the proper support. Mother was scheduled for discharge from the hospital on April 27, 2014. This [r]eport was substantiated.

. . .

Following the Child's reunification with the Father in April 2014, DHS had concerns that Father was not providing the adequate care for the Child. Father did not follow through with the aftercare plan concerning the Child's care, medical attention and arrangement for daycare. At times, the Child appeared dirty and unkempt. In addition, DHS suspected that Father permitted Mother to have unsupervised contact with the Child, which was against the standing visitation order.

Following the Child's reunification with Father in April 2014, it was discovered that Father relied heavily on the Child's former foster caregiver for childcare. Father regularly left the Child in the former foster caregiver's care-sometimes for several days at a time-with no contact with the caregiver.

. . .

Trial Court Opinion, 11/1/16, at 10-11 (citations to record omitted).

Again, the trial court held regular permanency review hearings in this matter. Throughout these reviews, the trial court maintained Child's

commitment and placement. Significantly, Mother passed away on April 16, 2015. *See* Order Verifying Deceased Status of Child's Parent, 7/27/16.

DHS filed petitions to terminate parental rights and for a goal change on November 3, 2015. The trial court held a combined termination/goal change hearing on July 27, 2016. In support thereof, DHS presented the testimony of the following: Rimoini Peace, a DHS social worker; Chanel Randolph, a Family School case manager; and Kristen Jenkins, a Children's Choice case worker. Father testified on his own behalf.

The trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). Father, through appointed counsel, filed a timely notice of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

1. The trial court erred in finding that Father's mental health was a basis for adoption where the mental health objective [was] completed by Father and subsequently waived by the Department of Human Services.

2. The trial court erred in finding that safety concerns prevented unsupervised visits by Father as no reasonable basis was stated on the record to support such a finding.

Father's Brief, at 7 (unnecessary capitalization omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id*. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, controls the termination of parental rights, and requires a bifurcated analysis, as follows:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).

> Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), and (2), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any *one* subsection of § 2511(a), well as subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc)*. Here, we analyze the court's termination order pursuant to § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

We first examine the court's termination of Father's parental rights under § 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216

- 9 -

(Pa. Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)).

In finding grounds for termination pursuant to § 2511(a)(1) and (2), the trial court stated:

> This [c]ourt found clear and convincing evidence to terminate father's parental rights pursuant to 23 Pa.C.S.A. 2511(a)(1) and (2).
>
> After hearing credible testimony of the DHS social worker, the Family School case worker, and the Children's Choice case worker, the [c]ourt found by clear and convincing evidence that their observations and conclusions regarding Father's inability to parent, inability to keep his [c]hild in a safe environment, and lack of [p]arental bond persuasive.
>
> The [c]ourt found Father's testimony regarding his assessment of the situation with the Mother's drug use and why the Child came into placement telling. The [c]ourt found Father's testimony incredible regarding taking his [c]hild to the foster mother only for events and not for primary caregiving. Further, Father admitted he lived with Mother during the period of that reunification against [c]ourt orders. The [c]ourt found Father's inability to take advantage of the opportunity of reunification with his [c]hild was unfortunate and indicative of Father's lack of understanding of his parental duties.

Trial Court Opinion, 11/1/16, at 22-23.

Father argues, however, "the trial court erroneously relied on a mental health objective for reunification that was not an issue and was waived by [DHS]." Father's Brief, at 10. Father references the court's statement on the record that he "seems to be disconnected from reality in many of his statements," as well as his lack of understanding of the role of a parent and inability to parent. *Id*.

Father further asserts that Child was not originally adjudicated dependent because of safety concerns related to Father. *See id*., at 11. In addition, his only remaining goals were housing, visitation, and Family School. *See id*. As such, Father maintains safety concerns were not an obstacle to reunification.[5] *See id*., at 11.

A review of the record supports the trial court's determination of a basis for termination under § 2511(a)(2). Rimoini Peace, a DHS social worker, testified that Father's objectives after Child was placed back into care, subsequent to attempted reunification, were housing, visitation, and Family School. *See* N.T., 7/27/16, at 16. She indicated that Father did not successfully complete Family School. *See id*., at 17. Peace's testimony was confirmed by Chanel Randolph, a Family School case manager, who indicated that Father attended only 61 of 121 days. *See id*., at 26-27. Randolph testified that Father presented supervision and safety issues, as

_____

[5] To the extent Father is attempting to challenge the imposition of supervised visitation, as argued by the Child-Advocate, *see* Child Advocate's Brief, at 29-20, we agree this claim is untimely and would be waived. *See* Pa.R.A.P. 903(a) (stating a notice of appeal "shall be filed within thirty days after the entry of the order from which the appeal is taken."). *See also* Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in lower court); *Fillmore v. Hill*, 665 A.2d 514, 515-16 (Pa. Super. 1995) (stating, "[I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error, such as an erroneous jury instruction, will result in waiver of that issue. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.")

- 11 -

well as a lack of acceptance of redirection. *See id*., at 27. Further, Peace indicated that there were concerns that Father "was using [his] uncle's house as a front," and was instead residing in a home previously determined to be unfit. *Id*., at 23.

Father's testimony suggests that he failed to appreciate the reasons for Child's placement. Father acknowledged that Child was placed because of Mother's drug use. However, he indicated that this did not "present a threat" to Child "because scientifically the womb is protected against all diseases and anything that enters into the mother." *Id*., at 51. Despite the fact that Child evidenced drugs in his system at birth, Father responded that he "didn't know if that was factual." *Id*., at 51-52. When pressed if factual, Father stated that Child's immune system would "clear it up" and again referred to the protection of the womb. *Id*., at 52. In addition, Father attempted to place blame for Mother wanting to stab her stomach while pregnant on the attempts to "take" her children. *Id*., at 50-51. *See also* Exhibit CA-1.

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id*. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any *one* subsection of § 2511(a) before

assessing the determination under § 2511(b). **_See In re B.L.W._**, 843 A.2d at 384.

We next determine whether termination was proper under § 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **_In re K.M._**, 53 A.3d 781, 791 (Pa. Super. 2012). In **_In re E.M._**, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **_In re K.M._**, 53 A.3d at 791. However, … evaluation of a child's bonds is not always an easy task.

**_In re T.S.M._**, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **_In re Adoption of J.M._**, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." **_In re Z.P._**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Moreover,

- 13 -

[w]hile a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In concluding that termination of Father's parental rights favors Child's needs and welfare under § 2511(b) of the Adoption Act, the trial court noted a lack of a bond between Father and Child. *See* Trial Court Opinion, 11/1/16, at 24. "The testimony provided this [c]ourt with clear and convincing evidence that Father was not bonded to his Child, and termination of his parental rights would be in the best interest of the Child." *Id*.

Father, however, presents no challenge or argument related to § 2511(b). As such, we find that Father has waived any claim regarding § 2511(b) and Child's needs and welfare. *See Dietrich v. Dietrich*, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule 1925(b) statement, any issues not raised in that statement are waived on appeal); *Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising

them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). *See also In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating, "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.") Nevertheless, in light of the requisite bifurcated analysis, we review this issue.

Here, the record likewise corroborates the trial court's termination orders pursuant to § 2511(b). After the failed reunification, Father's visitation remained supervised. *See* N.T., 7/27/16, at 37. Further, Kristen Jenkins, who supervised visits between Father and Child as part of her duties as a caseworker for Children's Choice, the provider agency through which Child was placed, testified that she did not believe visits should be unsupervised due to concerns with proper supervision and safety. *See id*., at 36, 41-42. Due to her observations during Family School sessions, Randolph also expressed safety concerns related to unsupervised visitation. *See id*., at 31. While Father and Child interacted well during visits, Jenkins recounted that, at times, Father was not engaged and was distracted by his phone or a book he brought with him. *See id*., at 36-37, 42-43. Moreover, he was not receptive to redirection. *See id*., at 37. Importantly, Jenkins also observed that Child no longer became upset at the conclusion of visits. *See id*.

In addition, but for the brief time of reunification with Father,[6] Child has been placed in a pre-adoptive home with Foster Mother, along with his younger sibling whom Foster Mother is already in the process of adopting, since birth. *See id.*, at 17-19. Both Jenkins and Peace attested to the attachment and bond between Child and Foster Mother. *See id.*,at 18-19, 38-39. As noted by Jenkins, Child's primary parental bond is with Foster Mother, whom Child calls "Mom." *Id*., at 38-39. Foster Mother meets Child's needs. *See id*., at 18-19, 38-39.

As such, acknowledging that Foster Mother has essentially been the *only* caregiver Child has ever known, both opined that it was in Child's best interest for Father's parental rights to be terminated. *See id*., at 18-19, 39-40.

As explained by Peace, "he's been placed with [Foster Mother] since the time of his birth. And other then the brief reunification period with Father, [Foster Mother] is the only caregiver [Child] knows. He appears comfortable with her. She's here to meet his daily needs. And they appear to have -- a bond." *Id.*, at 18-19. Likewise, both offered that Child would not experience irreparable harm as a result. *Id.* at 19, 40. Thus, as confirmed

---

[6] Evidence was presented that Child spent a great deal of time during the reunification period with Foster Mother. *See id*., at 11-15. Father attempted to explain this by indicating he would allow Child to go over to Foster Mother's home for parties and events. *See id*., at 45.

by the record, termination of Father's parental rights serves Child's needs and welfare.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

We, therefore, affirm the decree and order of the trial court.

Decree and order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/10/2017